**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

DEANGELO JACKSON,

Petitioner,

v.                                                         No. 2:19-cv-02145-MSN-tmp

GRADY PERRY,

      Respondent.

---

**ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

---

Before the Court are the Petition under 28 U.S.C. § 2254 for a writ of habeas corpus by a person in state custody filed by Petitioner DeAngelo Jackson, Tennessee Department of Correction ("TDOC") register number 539054, who is confined at the South Central Correctional Facility ("SCCF") in Clifton, Tennessee, (ECF No. 1), the Answer filed by Respondent (ECF No. 19), and Petitioner's Reply (ECF No. 23.)   As more fully discussed below, the issues Petitioner raises in his habeas petition are two:  1) whether the state court identified and applied the correct federal legal principles and 2) whether the claim is procedurally defaulted.  For the following reasons, the petition is **DISMISSED**.

I.     **STATE COURT PROCEDURAL HISTORY**

On June 27, 2014, a Shelby County Criminal Court jury convicted Petitioner DeAngelo Jackson of one count of especially aggravated robbery and one count of facilitation of attempted second-degree murder.  (ECF No. 18-1 at PageID 110.)  The trial court sentenced Jackson to an

effective sentence of thirty-two years in prison.[1]  (ECF No. 18-1 at PageID 111–12.)  Jackson appealed.  (ECF No. 18-1 at PageID 119.)  The Tennessee Court of Criminal Appeals ("TCCA") affirmed.  *State v. Jackson*, No. W2014-01981-CCA-R3-CD, 2015 WL 7526949 (Tenn. Crim. App. 2015), *perm. app. denied* (Tenn. 2015).

On May 3, 2016, Jackson filed a *pro se* petition in Shelby County Criminal Court pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101-122. (ECF No. 18-14 at PageID 566–69.)  The post-conviction court conducted an evidentiary hearing and denied relief in an order entered on April 12, 2017.  (ECF No. 18-14 at PageID 592.) Jackson appealed.  (ECF No. 18-14 at PageID 593.)  The TCCA affirmed.  *Jackson v. State*, No. W2017-00916-CCA-R3-PC, 2018 WL 1182794 (Tenn. Crim. App. 2018), *perm. app. denied* (Tenn. 2018).

## II.   FEDERAL COURT PROCEDURAL HISTORY

On March 1, 2019, Petitioner Jackson filed this petition pursuant to 28 U.S.C. § 2254 challenging his state conviction.  (ECF No. 1.)   On April 10, 2019, the Court directed Respondent to file a response to the petition.  (ECF No. 7.)  On July 11, 2019, Respondent filed the state court record.  (ECF No. 18.)  On July 12, 2019, Respondent filed an answer to the petition.  (ECF No. 19.)  On February 12, 2020, Jackson filed a reply.  (ECF No. 23.)

### A.   Federal Habeas Issues

In the petition, Jackson raises the following issues:

1.   The evidence was insufficient to support Petitioner's convictions for especially aggravated robbery and facilitation of attempted second-degree murder.  (Pet., ECF No. 1 at PageID 5);

---

[1]A count of employing a firearm during the commission of a dangerous felony was dismissed by operation of law.  (ECF No. 18-1 at PageID 110; ECF No. 18-1 at PageID 113.)

2

2.      Trial counsel provided ineffective assistance by:

a. failing to call Jemilra Simms, Keandra Webb, and David Mason as witnesses for the defense[2] (*id.* at PageID 13) and

b. failing to call Betty Webb and Darius Fleming as witnesses for the defense.  (*Id.* at PageID 15.)

Issues 1 and 2(b) have been reviewed by the TCCA and are exhausted.  Issue 2(a) has never been reviewed by the TCCA and is procedurally defaulted.

## III.   THE EVIDENCE

On direct appeal, the TCCA summarized the evidence presented at Jackson's trial:

The Defendant was indicted with especially aggravated robbery in Count 1, attempted second-degree murder in Count 2, and employing a firearm during the commission of a dangerous felony in Count 3 in connection with the robbery and shooting of Rodrigo Rivas.  Prior to trial, the State noted that attempted second-degree murder was the applicable accompanying dangerous felony in Count 3.

At trial, Mr. Rivas testified that, around 11:00 p.m. on the night of the offense, he and two friends were pushing a car into a carwash parking lot.  Mr. Rivas recalled that the area was dark but there were some street lamps.  While they were pushing the car, two people approached them from behind, one of whom had a gun.  The gunman fired a shot into the air, and Mr. Rivas' companions ran.  The gunman placed the gun against Mr. Rivas' head and ordered him "to get down on the floor, right next to the car."  Mr. Rivas complied to avoid being shot.  The gunman then demanded Mr. Rivas' wallet.  As Mr. Rivas was handing the gunman his wallet, he turned to see the gunman.  The gunman said, "Don't look at me" and shot Mr. Rivas in the back.  The gunman then demanded Mr. Rivas' phone.  Again, Mr. Rivas handed the gunman his phone and turned to look at the gunman.  The gunman said, "I told you, I'm going to kill you.  Don't look at me."  He then shot Mr. Rivas in the back a second time.  The entire episode lasted "three to five minutes," and the two robbers ran after they shot Mr. Rivas the

---

[2] Issue 2(a) of Petitioner Jackson's petition includes a witness named "Darris Flemming" [sic].  (*Id.*)  The testimony at Petitioner's post-conviction hearing and the post-conviction appeal refer to a witness named Darius Fleming.  (ECF No. 18-17; ECF No. 18-23.)  The Court concludes that "Darris Flemming" is a misspelling and that Petitioner intended to name Jackson's cousin, Darius Fleming, the witness discussed during the post-conviction proceedings.  The Court has elected to address counsel's failure to call Fleming as a witness for the defense in Issue 2(b), rather than 2(a).

second time.  Mr. Rivas explained that he did not see the gun, but he saw the gunman "twice quickly."  Mr. Rivas recalled that the gunman was wearing a hoodie that covered more of his hair and face, but Mr. Rivas saw the gunman's face.  Mr. Rivas identified that Defendant as the gunman.

After the Defendant and his companion had left the scene, Mr. Rivas looked around and saw that his friends were gone.  Mr. Rivas managed to get up and walk to a convenience store to find a phone.  People in the store called the police and an ambulance for him.  The gunshots went through Mr. Rivas's large intestine, coccyx (tailbone), and one of his testicles.  Mr. Rivas underwent multiple surgeries and wore a colostomy bag for a year.  At the time of trial, he still experienced pain from the injuries and could not sit for more than forty-five minutes to an hour.

About two weeks after the date of the offense, officers from the Memphis Police Department ("MPD") asked Mr. Rivas to view several photo lineups.  Mr. Rivas viewed the lineups, circled the Defendant's photo, and wrote, "This is the one who robbed me and shot me."  Mr. Rivas explained that he circled the Defendant's photo "right away" when he saw it.  Mr. Rivas also stated that, although the street lights in the area were not consistently illuminated, there was a street lamp directly above his car, and he was able to get a clear look at the Defendant's face.  Mr. Rivas said he was "a hundred percent" sure that the Defendant was the person who shot him.

Mr. Rivas also confirmed that he testified at a preliminary hearing in 2012.  Mr. Rivas admitted that he had "a little bit of confusion that day" and had trouble identifying the Defendant because the Defendant was not wearing a hoodie and was wearing glasses at the time.  As a result of his confusion, Mr. Rivas initially identified the Defendant as the person who shot him but then identified someone else who looked similar to the Defendant who was not wearing glasses.  Mr. Rivas explained that the Defendant was not wearing glasses at the time of the offense and that, on the day of the preliminary hearing, Mr. Rivas was under the influence of pain medication.

On cross-examination, Mr. Rivas denied telling a police detective on the day after the offense that he did not see the robber's face.  Mr. Rivas also recalled that, at the preliminary hearing, "they did make everyone take off their glasses."  Mr. Rivas noted that he identified someone else at the preliminary hearing, but he stated that he switched his identification back to the Defendant.  Mr. Rivas was permitted to listen to a recording of the preliminary hearing outside of the jury's presence in order to refresh his memory.  After listening to the recording, Mr. Rivas admitted that he identified a person named Kendrick Brown as the robber at the preliminary hearing.  However, Mr. Rivas insisted that he "came back to the

defendant."[3]  On redirect examination, Mr. Rivas said he was "very positive" that the Defendant was the person who robbed and shot him.

Marion Hardy testified that, on the night of the offense, he was helping Mr. Rivas and Jeremy Holmes push Mr. Rivas' car out of a carwash parking lot.[4]  As the three men were moving the car, two other men, one of which Mr. Hardy knew, were standing on the sidewalk.  Mr. Hardy thought that both men were carrying guns.  Mr. Hardy stated that he recognized one of the men as a person he knew as "Mulah."  Mr. Hardy identified the Defendant as "Mulah."

After Mr. Hardy had seen the two men, "all of a sudden" someone shot over Mr. Hardy's, Mr. Rivas', and Mr. Holmes's heads.  Mr. Hardy and Mr. Holmes "stood back," and Mr. Hardy saw someone "put [Mr. Rivas] in the car."  Then he heard one gunshot and assumed someone had shot Mr. Rivas.  After that, "two [additional] guys came from behind the building" and shot over Mr. Hardy and Mr. Holmes's heads.  Mr. Holmes "took off running," but Mr. Hardy lay down on the ground and gave the two other robbers his wallet.  After surrendering his wallet, Mr. Hardy ran away.  He did not see what happened with the Defendant and the man who was with him.  After the robbers left, Mr. Hardy saw Mr. Rivas stagger from his car and collapse in front of a barber shop.

Later, Mr. Hardy gave a statement to police and viewed a photo lineup.  Mr. Hardy identified a photo of the Defendant and wrote, "robbery, the mean friend" under his picture.  Mr. Hardy explained his notation, stating, "I never did think Mulah was that kind of person.  He didn't seem like he was that kind of person when I first met him."  However, Mr. Hardy's opinion of the Defendant changed when he saw him participate in the robbery.  Mr. Hardy stated that he was "ninety-nine percent" sure that the Defendant was one of the two men that robbed and shot Mr. Rivas.  Mr. Hardy agreed that ninety-nine percent was "about as certain as it gets."

On cross-examination, Mr. Hardy confirmed that he gave a statement to police the day after the offense but he did not identify the Defendant as one of the robbers at that time because "[t]hey didn't ask [him]."  Defense counsel then read a portion of Mr. Hardy's statement in which the police asked, "Can you identify the suspects that you saw [if you saw] them again?" and Mr. Hardy responded, "I

---

[3] In a bench conference, the prosecutor indicated that Mr. Rivas did not ultimately change his identification back to the Defendant at the preliminary hearing.  However, a copy of the preliminary hearing is not included in the record on appeal.

[4] According to Mr. Hardy, he was helping Mr. Rivas move the car out of the carwash parking lot because the owner of the carwash did not want the car on his property.  We note that Mr. Hardy's testimony contradicts that of the other witnesses in this detail.  However, neither party addressed the contradiction.

think so." Mr. Hardy admitted that he made that statement but maintained that he did not identify the Defendant because he did not know the Defendant's real name and because the police had not shown him a photo of the Defendant. Mr. Hardy also admitted that, three days after the offense, he called police out to the carwash and told them that a man sitting on the newspaper stand, Travis Brown, was one of the people involved in the robbery, but he still did not identify the Defendant. Mr. Hardy explained that he first identified the Defendant to the police when the police showed him the photo lineup containing the Defendant's picture. When Mr. Hardy saw the Defendant's picture and said "Mulah," the police informed him of the Defendant's name. On redirect examination, Mr. Hardy stated that he alerted the police to Mr. Brown because he thought Mr. Brown was involved in setting up the robbery.

Jeremy Holmes testified that, on the night of the offense, he was helping Mr. Rivas and Mr. Hardy push a car into a parking spot in a carwash parking lot so that Mr. Rivas could advertise the car as being for sale. Mr. Holmes asked two people who were walking down the sidewalk to help them push the car. However, before Mr. Holmes finished his sentence, one of the individuals pulled out a pistol and fired a shot into the air. Mr. Holmes "saw fire shoot out of the barrel" and ran. Mr. Holmes heard "like another three shots" as he was running. After the incident, Mr. Holmes saw Mr. Rivas walking down the sidewalk. Mr. Holmes told him to sit down because he could see blood dripping from Mr. Rivas' body, but Mr. Rivas acted as if he did not want to sit down. Mr. Holmes gave a statement to police and said he did not know the people who had committed the robbery. However, he later viewed a photo lineup, picked out a photo, and wrote, "I think this is the guy that shot in the air when [Mr. Rivas] was robbed, but I'm not one hundred percent sure." Mr. Holmes explained that the photo looked familiar but he was not sure of his identification because the robber had a hood on and he did not "want to falsely say, you know, what [he] didn't really see." On cross-examination, Mr. Holmes acknowledged that he did not see Mr. Rivas being robbed because he was running from the scene.

MPD Officer Eric Hutchinson testified that he responded to the scene of the robbery and shooting. There, he took photos and collected evidence. Officer Hutchinson found a nine-millimeter bullet casing near the sidewalk and what appeared to be blood on the ground. Officer Hutchinson agreed that the blood evidence appeared to move away from the car toward the shopping center on the other side of the parking lot. On cross-examination, Officer Hutchinson stated that he found a bullet casing but he did not find a bullet on the scene. He did not recover a gun, wallet, or phone from the scene. Officer Hutchinson did not know if anyone collected surveillance video from any of the businesses near the scene of the robbery.

MPD Detective Fausto Frias testified that he was assigned to investigate the robbery and shooting in this case. Detective Frias went to the hospital where Mr.

6

Rivas was being treated and spoke with Mr. Rivas. At that time, Mr. Rivas told him, "I saw who shot me, and I can identify him at a later date." While waiting for Mr. Rivas to be released from the hospital, Detective Frias spoke with some people who lived in the neighborhood where the robbery and shooting took place. Eventually, Detective Frias developed multiple suspects in the case and created several photo lineups to show the victims and other witnesses. Mr. Rivas identified the Defendant's photo in the fourth photo lineup. Based on that identification, Detective Frias obtained an arrest warrant for the Defendant, but he was unable to locate the Defendant. After several attempts to find the Defendant, Detective Frias called the Defendant's mother and told her that the police needed to talk to her son about the robbery. About an hour and a half after that call, the Defendant called Detective Frias and told the detective where he could be found. Detective Frias interviewed the Defendant, and the Defendant initially denied being present at the robbery or knowing anything about the robbery. After Detective Frias informed the Defendant that surveillance videos from the nearby businesses would show whether the Defendant was there, the Defendant admitted to being present at the robbery. However, the Defendant denied shooting anyone. He said that he heard shots and "took off running" to a friend's apartment. Detective Frias asked the Defendant for the friend's phone number and address, but the Defendant could not provide such information. The Defendant explained that he did not return to the scene to give a statement to police because he did not want to be involved. He also stated that he did not know who shot and robbed Mr. Rivas because he "just ran."

Detective Frias also showed the photo lineup to Mr. Holmes on the same day as the preliminary hearing. At that time, Mr. Holmes circled the Defendant's picture but said he was not one hundred percent sure about his identification.

On cross-examination, Detective Frias acknowledged that the Defendant had indicated on the Advice of Rights form that he could not read or write without the aid of eyeglasses. Detective Frias also admitted that he showed the photo lineups to the victims on different days. He explained that it was policy to show victims lineups when it was convenient for the victim.

After the State rested its case-in-chief, the trial court conducted a jury-out hearing to determine whether the Defendant's prior convictions could be used to impeach his testimony. The State noted that the Defendant had previous convictions of felon in possession of a handgun from 2011, theft of property over $1,000 from 2009, and theft of property under $500 from 2009. The Defendant argued that the crimes were substantially similar to the crimes for which he was being tried and that the convictions would be "substantially more prejudicial than probative." The State countered that none of the Defendant's prior convictions were for violent crimes. The trial court noted that "especially-aggravated robbery is a theft committed in a more egregious manner." However, the court found that the Defendant's prior conviction for felon in possession of a handgun was not

substantially similar to any of the charges for which the Defendant was on trial and that his convictions for theft were probative of the Defendant's "dishonesty." The court allowed the State to use the convictions to impeach the Defendant if he chose to testify. The Defendant elected not to testify.

Dr. Jeffrey Neuschatz testified as an expert in eyewitness identification. Dr. Neuschatz explained that longer exposure time, or how long someone has to evaluate or study information, will result in a better memory of what was studied. Additionally, Dr. Neuschatz explained that memory is more susceptible to impairment the longer the amount of time between the time someone studied something and the time the person was tested on what they studied. In short, Dr. Neuschatz explained that it was "[m]uch more difficult to remember things accurately when you don't get to study them for a long time and then you're tested a long time afterwards[.]" Dr. Neuschatz stated that, based on his research, the thirteen-day gap between the robbery of Mr. Rivas and Mr. Rivas' identification of the Defendant constituted a long gap. Dr. Neuschatz also stated that high-stress situations, such as the robbery in this case, impaired the reliability of identifications. Additionally, Dr. Neuschatz explained that the accuracy of an identification was affected when a weapon was used because the weapon drew people's attention and made them less attentive to other aspects of the scene, such as the identity of the perpetrator. Further, studies showed that head coverings impaired eyewitness identification, and identification accuracy was much worse when people were asked to identify someone who was wearing something that covered their hairline. In this case, Dr. Neuschatz noted that identification would be impaired if the suspect was wearing a hoodie. Dr. Neuschatz also explained that a witness's confidence in their identification did not mean that the identification was accurate. This is because the witness's confidence could be affected by outside influences, such as someone telling the witness they had chosen the right person. Moreover, Dr. Neuschatz noted that people have "a great deal of difficulty" identifying someone who is of a different race than themselves. In this case, Mr. Rivas and the Defendant were different races.

On cross-examination, Dr. Neuschatz confirmed that a witness's identification could be accurate even if it was made in a stressful situation. He also stated that an identification was more likely to be accurate if the witness was familiar with the identified person. He also admitted that it was possible for people to accurately identify someone who was of a different race than themselves.

\After deliberations, the jury convicted the Defendant of especially aggravated robbery in Count 1, facilitation of attempted second-degree murder as a lesser-included offense in Count 2, and employing a firearm during the commission of a dangerous felony in Count 3. The trial court, acting as the thirteenth juror, approved the verdicts in Counts 1 and 2. The State dismissed Count 3 on the ground that employing a firearm during the commission of a dangerous felony did not apply to facilitation of attempted second-degree murder. The trial court

ordered consecutive sentences of twenty-two years for especially aggravated robbery and ten years for facilitation of attempted second-degree murder for an effective sentence of thirty-two years.  The trial court denied the Defendant's motion for new trial, and this timely appeal followed.

*Jackson*, 2015 WL 75269499, at *1–*5.

The TCCA opinion on post-conviction appeal summarized Jackson's ineffective assistance of counsel claims, the evidence presented at the post-conviction hearing, and the post-conviction trial court's decision:

> The petitioner filed a timely pro se petition for post-conviction relief alleging numerous claims of ineffective assistance of counsel, including the failure to call alibi witnesses, Betty Webb and Darius Fleming, at trial.  Following the appointment of counsel, the post-conviction court held a hearing on the motion, during which only the petitioner and trial counsel testified.  According to the petitioner, he was not present at the scene of the crime.  Instead, the petitioner's grandmother, Ms. Webb, drove him to a movie theater on Airways Boulevard the night at issue.  The petitioner's sister, April Jackson, and his cousin, Mr. Fleming, were also in the car and went to the movie, too.  While at the movie theatre, they ran into the petitioner's ex-finance [sic].  The petitioner maintained he told trial counsel that Ms. Webb and Mr. Fleming were alibi witnesses and should be called as trial witnesses.  The morning of trial, however, trial counsel informed him that Ms. Webb called and indicated she and Mr. Fleming could not be present because Mr. Fleming was having seizures.  The petitioner later spoke with Ms. Webb, who denied this conversation and instead stated that trial counsel called her the morning of trial and indicated she and Mr. Fleming should not come to the courthouse because they were no longer needed as witnesses.  Ms. Webb died prior to the post-conviction hearing.
>
> Trial counsel testified that at the time of trial, she had been practicing law for twenty-seven years and had been a public defender the last seventeen years.  As a public defender, she had defended charges of varying complexity, from misdemeanors to first degree murder.  Another attorney originally served as lead counsel, and when trial counsel received the case, an investigation had already commenced.
>
> Trial counsel testified that following the incident, the petitioner told the investigating police officers that he was present at the scene of the crime but did not participate.  Later, the petitioner changed his story and told investigators with the public defender's office that he was at a movie with his cousin and sister at the time of the events, and they ran into the [sic] his ex-girlfriend while at the theatre.  Trial counsel was never able to locate the petitioner's ex-girlfriend.  Trial counsel

spoke with Ms. Jackson and Mr. Fleming, who gave different stories.   Ms. Jackson could not remember what night she and the petitioner went to the movies and referenced a different theatre than Mr. Fleming, so trial counsel did not subpoena her trial testimony.   Mr. Fleming recalled specific details of the evening, so trial counsel did subpoena his testimony.   However, the petitioner's grandmother called the morning of trial and asked if Mr. Fleming could be excused from testifying because he was having seizures, did not remember anything, and did not want to testify.   Trial counsel excused Mr. Fleming because she did not want a hostile witness present who could not offer helpful testimony. When they spoke on the telephone, Ms. Webb did not mention driving the petitioner, Mr. Fleming, and Ms. Jackson to the movie theatre on the night at issue, and the petitioner never told trial counsel that Ms. Webb drove them to the movie theatre that evening.

Trial counsel ultimately presented a defense of mistaken identity.   When doing so, she called identity expert Dr. Jeffrey Neuschatz to explain why, due to the victim's race and the short period of time he observed the perpetrator, it was possible the victim misidentified the petitioner.   The victim, however, was a credible witness.   Trial counsel was able to convince the jury the petitioner did not shoot the victim, so he was convicted of lesser-included offenses.

Following the hearing, the post-conviction court denied the petition, finding the petitioner failed to carry his burden of proving either deficient performance or prejudice.   When doing so, the post-conviction court relied on these findings of facts:

> "I think [trial counsel's] assessment of the case was totally proper. If she had tried to put on an alibi after telling the police that he was there but he didn't do it and then all of a sudden now put on an . . . alibi witness who do not agree with each other as to where he was, things of that nature, I find that to be totally, totally incredulous why someone would do that.   Put on something she knows to be false because she knew that number one, he told the police that he was there.   Number two, one person said they were at one movie theater.   Another person didn't remember what night it was and wasn't sure what theatre they went to.   It wasn't much of an alibi.
>
> . . .
>
> I don't put any credence in the [petitioner's] testimony.   I don't see anything that [trial counsel] did that was faulty in any way, in any respect. . . . . I think if she had put on alibi, those people might have been charged with aggravated perjury, as well as [the petitioner] could be today because I don't put any—I don't believe anything he had to say."

10

This timely appeal followed.

*Jackson*, No. W2017-00916-CCA-R3-PC, 2018 WL 1182794, at *5–*6.

## IV.   LEGAL STANDARDS

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

### A.   Exhaustion and Procedural Default

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts pursuant to 28 U.S.C. § 2254(b) and (c).  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  The petitioner must "fairly present"[5] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).   Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have

---

[5] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made."  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  Nor is it enough to make a general appeal to a broad constitutional guarantee.  *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted)).[6] In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If a petitioner's claim has been procedurally defaulted at the state level, the petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or that a failure to review the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction

---

[6] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 54.) (internal quotation marks and citations omitted).

12

of a person who is actually innocent of the crime. *See House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

### B.   Merits Review

Pursuant to Section 2254(d), where a claim has been adjudicated in state courts on the merits, a habeas petition should only be granted if the resolution of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 182. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412–13. The state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue. *Id.* at

13

409. The writ may not issue merely because the habeas court, "in its independent judgment," determines that the "state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

There is minimal case law addressing whether, under § 2254(d)(2), a decision was based on "an unreasonable determination of the facts." In *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.[7] In *Rice v. Collins*, 546 U.S. 333 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice*, 546 U.S. at 341- 42.

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and has emphasized that, pursuant to § 2254(e)(1), the state court factual determination is presumed to be correct absent clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented during the state court proceeding. *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

### C.   **Ineffective Assistance**

---

[7] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. The Court found it unnecessary to reach that issue, and left it open "for another day." *Id.* at 300–01, 303 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006), in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To succeed on this claim, a movant must demonstrate two elements: 1) that counsel's performance was deficient, and 2) "that the deficient performance prejudiced the defense." *Id.*  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Recently, the Sixth Circuit opined that this standard is "even more difficult to meet in habeas cases, where the review that applies to *Strickland* claims is 'doubly deferential.'" *Tackett v. Trierweiler*, 956 F,3d 358, 373 (6th Cir. Apr. 15, 2020) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (internal quotation marks and citation omitted).

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689.  The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

at 694.[8]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.* at 694.  It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'  *Id.* at 693.  Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'  *Id.* at 687."  *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail.  "Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The deference accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when reviewing an ineffective assistance claim:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at 123, 129 S. Ct. at 1420 [(2009)].  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at 123, 129 S. Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

A criminal defendant is entitled to the effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  The failure to raise a nonfrivolous issue on appeal does not constitute *per se* ineffective assistance of counsel, as "[t]his process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being

---

[8] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient.  *Strickland*, 466 U.S. at 697.

evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted). Claims of ineffective assistance of appellate counsel are evaluated using the *Strickland* standards. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief); *Smith v. Murray*, 477 U.S. at 535–36 (failure to raise issue on appeal). To establish that appellate counsel was ineffective, a prisoner:

> . . . must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal - that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Smith v. Robbins*, 528 U.S. at 285 (citation omitted).[9]

An appellate counsel's ability to choose those arguments that are more likely to succeed is "the hallmark of effective appellate advocacy." *Matthews v. Parker*, 651 F.3d 489, 523 (6th Cir. 2011) (quoting *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003)). It is difficult to show

---

[9] The Sixth Circuit has identified a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1.  Were the omitted issues "significant and obvious?"
2.  Was there arguably contrary authority on the omitted issues?
3.  Were the omitted issues clearly stronger than those presented?
4.  Were the omitted issues objected to at trial?
5.  Were the trial court's rulings subject to deference on appeal?
6.  Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7.  What was the appellate counsel's level of experience and expertise?
8.  Did the petitioner and appellate counsel meet and go over possible issues?
9.  Is there evidence that counsel reviewed all the facts?
10. Were the omitted issues dealt with in other assignments of error?
11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

that appellate counsel was deficient for raising one issue, rather than another, on appeal.  *See id.*
"In such cases, the petitioner must demonstrate that the issue not presented was clearly stronger
than issues that counsel did present."  *Id.*  Defendant must show that "there is a reasonable
probability that inclusion of the issue would have changed the result of the appeal."  *McFarland
v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

"There is no constitutional right to an attorney in state post-conviction proceedings.
Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such
proceedings."  *Coleman*, 501 U.S. at 752 (internal citations omitted).  Attorney error cannot
constitute "cause" for a procedural default "because the attorney is the petitioner's agent when
acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of
attorney error."  *Id.* at 753 (internal quotation marks omitted).  Where the State has no
constitutional obligation to ensure that a prisoner is represented by competent counsel, the
petitioner bears the risk of attorney error.  *Id.* at 754.

In 2012, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012), which
recognized a narrow exception to the *Coleman* rule, that "[w]here, under state law, claims of
ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . .
."  *Martinez*, 566 U.S. at 17.  In such cases, "a procedural default will not bar a federal habeas
court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the
initial-review collateral proceeding, there was no counsel or counsel in that proceeding was
ineffective."  *Id.*  The Supreme Court also emphasized that

> [t]he rule of *Coleman* governs in all but the limited circumstances recognized
> here. . . . It does not extend to attorney errors in any proceeding beyond the first
> occasion the State allows a prisoner to raise a claim of ineffective assistance at
> trial, even though that initial-review collateral proceeding may be deficient for
> other reasons.

18

*Id.* The requirements that must be satisfied to excuse a procedural default under *Martinez* are:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 17) (emphasis and alterations in original).

*Martinez* considered an Arizona law that did not permit ineffective assistance claims to be raised on direct appeal. *Martinez*, 566 U.S. at 4. In the Supreme Court's subsequent decision in *Trevino*, the Court extended its holding in *Martinez* to jurisdictions wherein a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." 569 U.S. at 429. *Trevino* modified the fourth *Martinez* requirement for overcoming a procedural default. *Martinez* and *Trevino* apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

## V.    ANALYSIS OF PETITIONER'S CLAIMS

### A.    Sufficiency of the Evidence

**1. The evidence was insufficient to support Petitioner's convictions for especially aggravated robbery and facilitation of second-degree murder. (ECF No. 1 at PageID 5.)**

Petitioner Jackson contends that the prosecution witnesses' identification testimony was not sufficiently corroborated by other evidence and that the evidence failed to establish that Jackson knew that the gunmen intended to murder the victim. (*Id.* at PageID 10–11.) Petitioner

19

argues that the evidence merely established that Petitioner may have known the gunman intended to rob the victim.  (*Id.* at 11.)   Respondent replies that the TCCA identified and applied the proper standard and reached a reasonable decision.  (ECF No. 19 at PageID 770–71.)

The TCCA addressed this claim on direct appeal and opined:

> The Defendant argues that the evidence was insufficient to prove his identity as the person who committed the offenses.  The Defendant contends that "the only evidence purporting to identify [the Defendant] as the robber is the testimony of Mr. Rivas" and notes that there was no forensic evidence linking him to the crime. The State argues that there was sufficient evidence to establish the Defendant's identity as one of the robbers.
>
> Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e).  Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded on other grounds by* Tenn. R. Crim. P. 33 as *stated in State v. Moats*, 906 S.W.2d 431, 434 n.1 (Tenn. 1995).  This court will not reweigh the evidence.  *Id.*  Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).
>
> A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The defendant bears the burden of proving why the evidence was insufficient to support the conviction.  *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914.  On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom."  *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).
>
> The identity of the perpetrator is "an essential element of any crime."  *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006).  Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence. . . ."  *Id.* (internal quotation marks omitted).  The question of identity is a question of fact left to the trier of fact to resolve.  *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Especially aggravated robbery is defined as a robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39–13–403(a) (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39–13–401(a) (2010). The definition of "deadly weapon" includes a firearm. Tenn. Code Ann. § 39–11–106(a)(5) (Supp. 2011). "Serious bodily injury" is a bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty, or a broken bone of a child who is eight years of age or under. Tenn. Code Ann. § 39–11–106(a)(34) (Supp. 2011).

As applicable to this case, second-degree murder is defined as "[a] knowing killing of another[.]" Tenn. Code Ann. § 39–13–210(a)(1) (2010). As charged in this case, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of [second-degree murder], and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39–12–101(a)(2) (2010). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39–11–402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39–11–403(a) (2010).

In this case, the evidence is sufficient to prove the Defendant's identity for the purposes of his convictions. Mr. Rivas testified that he turned to see the robber's face two times during the robbery. Mr. Rivas also stated that he saw the robber's face but not the gun that shot him. While the lighting in the area was spotty, there was a street lamp directly above Mr. Rivas' car, and he was able to see the person's face. After he was released from the hospital, Mr. Rivas viewed several photo lineups and selected the Defendant's photo as the person who robbed him. Although Mr. Rivas questioned his identification at the preliminary hearing, he explained that he was confused by the Defendant's eyeglasses and that he was under the influence of pain medication at the time. Additionally, Mr. Hardy, who knew the Defendant by a nickname, identified the Defendant as one of the people who forced Mr. Rivas to the ground next to his car. The Defendant was able to challenge both of these identifications through cross-examination and through his own eyewitness identification expert. However, the jury made a factual finding that the Defendant was the person who committed the offenses. The evidence was sufficient to support their conclusion.

Further, when viewed in a light most favorable to the State, the evidence is sufficient to establish the other elements of each crime. Regarding the Defendant's conviction for especially aggravated robbery, the Defendant and his companion took property from Mr. Rivas through the use of violence or by

putting Mr. Rivas in fear.  Their demands for Mr. Rivas' property show that they acted intentionally and knowingly.  During the course of the robbery, Mr. Rivas was shot with a gun, a deadly weapon, and sustained serious bodily injury to his large intestine, tail bone, and testicle, which required surgery.  The evidence is sufficient to support the Defendant's conviction for especially aggravated robbery.

As to facilitation of attempted second-degree murder, the Defendant and his companion stood over Mr. Rivas with a gun, and at least one of them shot Mr. Rivas in the back.  After each shot, Mr. Rivas heard someone say, "Don't look at me," and after the second shot, the gunman said, "I'm going to kill you."  Mr. Rivas was shot twice in the back.  A rational juror could conclude that the shooter acted with the intent to cause Mr. Rivas' death and believed that shooting Mr. Rivas in the back would cause his death without further action from the shooter. Further, the Defendant was standing next to his companion over Mr. Rivas as Mr. Rivas lay on the ground, so the jury could reasonably conclude that the Defendant knowingly furnished substantial assistance in the attempt to kill Mr. Rivas.  The evidence was sufficient to support his conviction for facilitation of attempted second-degree murder.  The Defendant is not entitled to relief on this issue.

*Jackson*, 2015 WL 7526949, at *5–*6.

A challenge to the sufficiency of evidence addresses whether "the government's case was so lacking that it should not have even been submitted to the jury."  *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Banks v. United States*, 437 U.S. 1, 16 (1978)).  "[A] reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a 'meaningful opportunity to defend' against the charge against him and a jury finding of guilt 'beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. at 314–15).  The habeas court asks only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319 (emphasis in original).

This standard requires a federal district court to examine the evidence in the light most favorable to the State.  *Id.* at 326 ("[A] federal habeas corpus court faced with a record of

conflicting facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). A federal habeas court may not intrude on the trier of fact's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319.

Sufficiency of evidence claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, on direct appeal, the reviewing court defers to the trier of fact, and second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Id.* (internal quotation marks omitted). The federal habeas court may overturn the state court's rejection of such a claim only if the state court's decision was "objectively unreasonable." *Id.* (citation omitted).

Petitioner contends that the TCCA's decision violates and unreasonably applies the Supreme Court's decision in *Jackson v. Virginia*. (ECF No. 1 at PageID 5.) Petitioner also argues that the TCCA based its decision on an unreasonable determination of facts. (*Id.*) Petitioner bases his argument on his contentions that the victim-witness identification was questionable and that the evidence "only establishe[d] that [Petitioner] may have known the gunmen [ ] intended to rob the victim." (*Id.* at PageID 10–11.)

Respondent replies that Petitioner has no right to relief under the deferential standard for sufficiency of the evidence. (ECF No. 19 at PageID 770.) According to Respondent, the TCCA correctly identified and applies *Jackson v. Virginia* to analyze Petitioner's claim and did not base

its decision on an unreasonable determination of the facts given the evidence presented in the state court proceedings.  (*Id.*)

Petitioner's argument turns on witness credibility – the province of the jury rather than the habeas court, which the Respondent acknowledges by asserting that both Rivas and Hardy identified Petitioner despite defense counsel's cross-examination and a challenge from an eyewitness identification expert.  (*Id.*)  Regarding the count of facilitation of attempted second-degree murder, Respondent emphasizes that Rivas' testified that Petitioner and his companion stood over Rivas with a gun and at least one person shot Rivas twice in the back.  (*Id.* at PageID 771.)  Respondent relies on Rivas's testimony that the gunman told Rivas not to look at him after each shot and threatened to kill Rivas after the second shot.  (*Id.*)  According to Respondent, a rational trier of fact could convict Petitioner of especially aggravated robbery and facilitation of second-degree murder on this evidence.  (*Id.*)  Respondent concludes that the TCCA's decision on sufficiency of the evidence was not unreasonable.  (*Id.*)

On direct appeal, the TCCA first correctly identified *Jackson* as the applicable Supreme Court decision.  *See State v. Jackson*, 2015 WL 7526949, at *5.  Next the TCCA identified the elements of especially aggravated robbery, second-degree murder, and facilitation under Tennessee law.  *Id.* at *6.  That court then summarized the relevant evidence supporting Petitioner's convictions.  *Id.*  The TCCA emphasized Rivas's observations of the robber's face, illuminated by direct streetlamp light and Rivas's identification of Petitioner in a photographic array; Hardy's familiarity with and identification of Petitioner; the knowing and intentional demands for Rivas' property; the taking of property from Rivas through the use of violence or by putting Rivas in fear; and Rivas's serious bodily injuries.  *Id.*

Based on this Court's review of the trial transcripts, the TCCA correctly concluded that the State presented sufficient evidence to support Petitioner's especially aggravated robbery and facilitation of second-degree murder.  Given the deference due the TCCA, this Court finds that the TCCA's decision did not violate or unreasonably apply *Jackson v. Virginia* and that the TCCA did not base its decision on an unreasonable determination of the facts.  Therefore, Issue One is **DENIED**.

### B.  Ineffective Assistance

**2(a).  Trial counsel provided ineffective assistance by failing to call Jemilra Simms, Keandra Webb, and David Nason as witnesses for the defense. (ECF No. 1 at PageID 5.)**

Petitioner Jackson contends that he told trial counsel that Jemilra Simms, Keandra Webb, and David Mason were alibi witnesses.  (Pet., ECF No. 1 at PageID 13.)  He alleges that counsel failed to interview these witnesses and refused to call them to the stand.  (*Id.*)  Respondent replies that this issue is procedurally defaulted and that the procedural default cannot be excused because the claim is not substantial under *Martinez*.  (ECF No. 19 at PageID 777.)

This claim was not exhausted before the TCCA on post-conviction appeal.  (ECF No. 18-23 at PageID 686–87.)  Jackson seeks to excuse the procedural default of his ineffective assistance of trial counsel claim by asserting that his post-conviction counsel provided ineffective assistance by failing to present all issues raised in the *pro se* post-conviction petition. (ECF No. 1 at PageID 14.)  Petitioner also contends that his default should be excused because he is actually innocent of the offenses of conviction.[10]  (*Id.*)

---

[10] A claim of "actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *Muntaser v. Bradshaw*,

25

Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective. *Sutton*, 745 F.3d at 787. To qualify as "substantial" under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel. *Martinez*, 566 U.S. at 14

Petitioner's *pro se* post-conviction petition denoted that Betty Webb and Darius Fleming were alibi witnesses but failed to identify Jemilra Simms, Keandra Webb, and David Nason as alibi witnesses. (ECF No. 18-14 at PageID 567.) The post-conviction transcript contains no testimony about Jemilra Simms, Keandra Webb, and David Nason. (ECF No. 18-17.) Petitioner Jackson has not provided affidavits from these potential witnesses and has not articulated the substance of any testimony they would have provided. Speculation and conclusory statements cannot establish a substantial federal habeas claim. Jackson cannot establish that his issue was substantial under *Martinez* because it is without factual support.

Jackson has not established that his post-conviction counsel was ineffective for failing to bring this claim of ineffective assistance of trial counsel or that the claim was substantial under *Martinez*. Jackson has not satisfied the requirements to overcome the procedural default of this issue. Issue 2(a) is procedurally defaulted and is **DENIED**.

---

429 F. App'x 515, 521 (6th Cir. 2011) ("an actual innocence claim operates only to excuse a procedural default so that a petitioner may bring an independent constitutional challenge."). The actual innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. *Bouseley v. United States*, 523 U.S. 614, 623 (1998) ("It is important to note . . . that 'actual innocence' means factual innocence, not mere legal insufficiency."). However, the Sixth Circuit has not extended the actual innocence exception to non-capital cases. *See Lee v. Brunsman*, 474 F. App'x 439, 442 (6th Cir. 2012). Regardless, Jackson has not presented any viable argument or evidence to demonstrate that he was actually innocent of the charges for which he was convicted. His actual innocence claim has no merit.

26

**2(b). Trial Counsel performed deficiently by failing to call Betty Webb and Darius Fleming as witnesses for the defense.  (ECF No. 1 at PageID 5.)**

Petitioner raised his contention that his trial counsel provided ineffective assistance by failing to call Webb and Fleming as trial witnesses in the post-conviction appeal.[11]  (ECF No. 18-23 at PageID 685–87.)  Jackson contends that Webb and Fleming would have provided him with an alibi.  (*Id.*)  Respondent replies that the TCCA's decision that Petitioner failed to demonstrate deficient performance by counsel does not contradict *Strickland* and is not based on an unreasonable determination of the established facts.  (ECF No. 19 at PageID 782–85.)

After identifying the proper federal standard for analysis of Petitioner's claims of ineffective assistance, *Strickland*, *Jackson v. State*, 2018 WL 1182794, at *7–*8, the TCCA reviewed this claim and opined:

> When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing.  *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).  This is the only way the petitioner can establish that:
>
> > (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of [p]etitioner.

---

[11] The Court has chosen to address this issue as it was raised in the post-conviction appeal.  To the extent the issue may be construed to allege deficiencies in the post-conviction proceedings, a state is not constitutionally required to provide a convicted felon with the means to collaterally attack his conviction.  *Pennsylvania v. Finley*, 481 U.S. 551 (1987).  A federal writ of habeas corpus will not issue when a petitioner is merely challenging errors or deficiencies arising from a state post-conviction proceeding.  *Kirby v. Dutton*, 794 F.2d 245 (6th Cir. 1986).  Thus, a claim relating to Jackson's post-conviction proceeding will not support an award of habeas corpus relief.

*Id.*  Even if a petitioner is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the petitioner is not entitled to post-conviction relief unless he produces a material witness at his post-conviction evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified favorably in support of his defense if called."  *Id.* at 758.  Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong *Strickland* test.  *Id.*

Other than the petitioner's own testimony, which was contrary to the statement he gave to the police and which the post-conviction court found not to be credible, the petitioner failed to offer any proof regarding what Ms. Webb and Mr. Fleming would have said had they been called to testify at trial.  Moreover, trial counsel testified that the petitioner never informed her Ms. Webb drove him to the movie theatre on the night in question, and she made a strategic decision not to call Mr. Fleming because he had been having seizures, could not remember anything, and did not want to appear at trial.  This Court will not reweigh the credibility determinations of the post-conviction court, nor will it second guess the tactical and strategic decisions of trial counsel made after adequate trial preparation. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997).  The petitioner has failed to carry his burden of proving trial counsel's failure to call Ms. Webb or Mr. Fleming to testify at trial prejudiced the outcome of his trial and, therefore, is not entitled to post-conviction relief.

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

*Jackson v. State*, 2018 WL 1182794, at *8.

Jackson testified that he told trial counsel that his cousin, [Darius] Fleming and his grandmother, Betty Webb were alibi witnesses.  (ECF No. 18-17 at PageID 649.)  Jackson testified that his grandmother died before the post-conviction hearing.  (*Id.* at PageID 650.)  Jackson's post-conviction appellate brief states that "the whereabouts of Darius Fleming are unknown."  (ECF 18-23 at PageID 686.)  Trial counsel testified that Petitioner Jackson "never mentioned Betty Webb ever."  (ECF No. 18-17 at PageID 621.)  Counsel testified that Jackson:

. . . never told me that he was at a movie the night this happened with his grandmother.  That was never mentioned to me at all.  The day of the trial his grandmother called me or a woman who said she was his grandmother called me to tell me that his cousin could not come to trial because he had had seizures, didn't remember anything, didn't want to testify, couldn't remember anything

about the circumstances, and would I please excuse his appearance and not get him held in contempt or in trouble, you know, with the Court.

(*Id.* at PageID 630.)  Counsel testified that she told the woman "fine, because [she] didn't want somebody coming down here who didn't remember anything or couldn't add anything." (*Id.* at PageID 634.)

Petitioner Jackson testified that he told trial counsel "that [his] grandmother drove [him] and [Fleming] to the movie theater on Airways, down Airways to the Malco movie theater and that [he saw] my ex-fiancée there." (*Id.* at PageID 649.)  Trial counsel testified that she talked to Jackson about alibi witnesses and told him that "[he] cannot tell the police you're here at the scene of this crime and you did not do it and then have an alibi witness who said you're somewhere else.  It's either one or the other." (*Id.* at PageID 623–24.)  Trial counsel told Jackson that she would do a second investigation to get in touch with those people to see if she could find them and determine whether he had a legitimate alibi. (*Id.* at PageID 624.)  Trial counsel testified that she made a decision "not to call the sister"[12] because she couldn't remember when they were at the movie.  She had no idea what day it was.  She and [Fleming] said they were at two different movie theaters that night.  But [Fleming] gave pretty specific details.  And I talked to both of them on the phone and since she couldn't remember anything, I didn't feel comfortable with her.  [Fleming] was pretty specific. (*Id.* at PageID 634.)

Jackson has not provided any affidavits to support this claim.  The Court is left to guess what specific testimony Webb and Fleming might have offered.  Conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice.  *See United States*

---

[12] Petitioner Jackson testified that his sister's name was April Jackson. (*Id*. at PageID 652.)

*v. Vargas*, 920 F.2d 167, 169–70 (2d Cir. 1990); *Adams v. Jago*, 703 F.2d 978, 981 (6th Cir. 1983).

Counsel's strategic decision against using Fleming's testimony is not rebutted by Jackson's conjecture that Fleming should not have been released from his subpoena and should have been required to testify at trial. Deference to the state court decision on this issue is appropriate. Therefore, Issue 2(b) is **DENIED**.

The issues raised in this petition are without merit and procedurally defaulted. The petition is **DISMISSED WITH PREJUDICE**.

## VI.   APPELLATE ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts (1977). A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2)-(3). A "substantial showing" occurs when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must demonstrate that reasonable

30

jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed further).

A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

In this case, there can be no question that the claims in this petition are without merit and procedurally defaulted. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

In this case for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore **CERTIFIED**, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith and leave to appeal *in forma pauperis* is **DENIED**.[13]

**IT IS SO ORDERED**, this 31st day of March 2022.

*s/ Mark Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE

---

[13] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry for this order. *See* Fed. R. App. P. 24(a)(5).